# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## CA 18-169 consolidated with CA 18-170, CA 18-171, CA 18-172, CA 18-173, CA 18-174, CA 18-175, CA 18-176, & CA 18-179

PATRICK BOWLING, ET AL.

VERSUS

CITGO PETROLEUM CORPORATION, ET AL.

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2007-2604
HONORABLE SHARON D. WILSON, DISTRICT JUDGE

**********

SYLVIA R. COOKS
JUDGE

**********

Court composed of Sylvia R. Cooks, John D. Saunders, and Elizabeth A. Pickett, Judges.

**AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.**

Pickett, J., concurs in part and dissents in part with written reasons.

Robert E. Landry
Patrick D. Gallaugher
Kevin P. Fontenot
Scofield, Gerard, Pohorelsky, Gallaugher & Landry
901 Lakeshore Drive, Suite 900
Lake Charles, LA 70601
(337) 433-9436
COUNSEL FOR DEFENDANT-APPELLANT:
    Citgo Petroleum Corporation

Craig Isenberg
Kyle W. Siegel
Joshua O. Cox
Barrasso Usdin Kupperman Freeman & Sarver, LLC
909 Poydras, 24th Floor
New Orleans, LA 70112
(504) 589-9700
COUNSEL FOR DEFENDANT APPELLANT:
    Citgo Petroleum Corporation


Wells T. Watson
Jake D. Buford
Baggett, McCall, Burgess, Watson & Gaughan
P. O. Drawer 7820
Lake Charles, LA 70606-7820
(337) 478-8888
COUNSEL FOR PLAINTIFFS-APPELLEES:
    Alton Young, Sammy Timpa, Corey Spikes, Robert Paggen, Patrick Bowling, Larry Martin, Michael Colletta, Terryl Lambright, Michael Crewell, Zachary Forsyth, Dustin Daigle, Chris Judice, Stephen L'Hoste, Richard McCoy


Richard Elliott Wilson
Somer G. Brown
Cox, Cox, Filo, Camel & Wilson, LLC
723 Broad Street
Lake Charles, LA 70601
(337) 436-6611
COUNSEL FOR PLAINTIFFS-APPELLEES:
    Michael Crewell, Dustin Daigle, Chris Judice, Michael Colletta, Terryl Lambright, Patrick Bowling, Larry Martin, Stephen L'Hoste, Richard McCoy, Robert Paggen, Corey Spikes, Sammy Timpa, Zachary Forsyth, Alton Young

**COOKS, Judge.**

These appeals involve nine cases consolidated for trial, involving twenty-six individual plaintiffs. Defendant, CITGO Petroleum Corporation (CITGO), appeals the judgment of the trial court awarding damages to twenty-four plaintiffs impacted by CITGO's negligent release of slop oil into adjacent waterways and the air release of sulfur dioxide and hydrogen sulfide.

## FACTS AND PROCEDURAL HISTORY

The facts giving rise to these lawsuits have been the subject of several appeals before this court and the Louisiana Supreme Court. *See Arabie v. CITGO Petroleum Corp.*, 10-2605 (La. 3/3/12), 89 So.3d 307 (*Arabie I*); *Arabie v. CITGO Petroleum Corp.*, 15-324 (La.App. 3 Cir. 10/7/15), 175 So.3d 1180, *writ denied*, 15-2040 (La. 1/8/16), 184 So.3d 694 (*Arabie II*); *Cormier v. CITGO Petroleum Corp.*, 17-104 (La.App. 3 Cir. 10/4/17), 228 So.3d 770, *writ denied*, 17-2138 (La. 2/9/18), 237 So.3d 491; *Bradford v. CITGO Petroleum Corp.*, 17-296 (La.App. 3 Cir. 1/10/18), 237 So.3d 648, *writ denied*, 18-272 (La. 5/11/18), 241 So.3d 314; *Albarado v. CITGO Petroleum Corp.*, 17-823 (La.App. 3 Cir. 5/16/18), 247 So.3d 818; *Fontenot v. CITGO Petroleum Corp.*, 17-924, 17-925 (La.App. 3 Cir. 5/23/18), 247 So.3d 837. In *Bradford*, 237 So.3d at 657-58, this court set out the operative facts as follows:

> On June 19, 2006, following a local flash flood, CITGO's Calcasieu Parish Refinery released four million gallons of slop oil and seventeen million gallons of wastewater into the Calcasieu River, contaminating over 100 miles of coastline with toxic liquids and mousse-like substances that emitted toxic fumes in addition to being toxic upon contact. The spill was the result of the failure and overflow of CITGO's closed-system, waste-water treatment unit. The overflow was described as a catastrophic event and an environmental disaster by CITGO's own representatives. The clean-up of the spill lasted for approximately six months, from June to December, 2006.
>
> CITGO's Material Safety Data Sheet (MSDS) on slop oil from March 2006 ranks it as a chronic health and fire hazard. The MSDS states that the oil is extremely flammable and poisonous, and it contains Hydrogen Sulfide ($H_2S$) gas which may be fatal if inhaled. It can enter the lungs and cause damage. It is harmful or fatal if swallowed. Slop oil contains above di minimus levels of benzene, a known cancer hazard

which can cause leukemia and other blood disorders, H sub2 S, xylene, toluene, n-hexane, and ethylbenzene. Benzene, toluene, and xylene are volatile organic compounds (VOCs). VOCs are chemicals that evaporate from a solid or liquid form at room temperature; long-term exposure can cause damage to the liver, kidneys, and central nervous system; short-term exposure can cause eye and respiratory tract irritation, headaches, dizziness, visual disorders, fatigue, loss of coordination, allergic skin reactions, nausea, and memory impairment. Pursuant to CITGO's MSDS, slop oil also contains hexane, heptane, octanes, nonane, and trimethylbenzenes. Slop oil and/or its components are listed on the Toxic Substances Control Act (TSCA) inventory.

Also on June 19, 2006, CITGO's steam lines became submerged and the facility released H sub2 S and sulfur dioxide (S02) from sixty stacks in illegal concentrations for a full day, approximately twelve hours. The wind was blowing from the southeast toward the north and northwest, then calming for parts of the day, allowing the toxic emissions to release into the surrounding community.

CITGO stipulated to fault for causing both the release of the slop oil and the air release of sulfur dioxide and hydrogen sulfide. These nine consolidated cases proceeded to trial on the issue of causation and any amount of damages due for each of the twenty-six plaintiffs' symptoms as a result of exposure to either slop oil, the air release, or both. In all of the cases, a jury trial was waived and the damages of each plaintiff was limited to $50,000.00.

In docket number 18-169, the plaintiffs, Patrick Bowling, Michael Colletta, Michael Crewell,[1] Dustin Daigle, Zachary Forsyth, Chris Judice, Terryl Lambright, Stephen L'Hoste, Larry Martin, Richard McCoy, Robert Paggen, Corey Spikes, Sammy Timba, and Alton Young, were employees of Phoenix Electric working at the Calcasieu Refinery where they allege they were exposed to slop oil released by CITGO. In docket number 18-170, Donald Mouton and Ebony (Mouton) Jack claim they were cutting grass in the Carlyss area when they were exposed to the chemicals from the air release from the CITGO refinery. In docket number 18-171, Odelia Dowling[2] claims she was

---

[1] Mr. Crewell died during the pendency of this suit and his sons were substituted as plaintiffs.

[2] Mrs. Dowling died during the pendency of this suit and her children were substituted as plaintiffs.

exposed to toxins when she delivered lunch to her daughter's fiancée at CITGO on June 20, 2006. In docket number 18-172, Ricky Matthews claims he was exposed to slop oil while at a family event on June 20, 2016, at the I-210 beach on the Calcasieu River north of the CITGO facility. In docket number 18-173, Leslie Mouton claims she was exposed to the air release when she took lunch to her nephew at Colonial Pipeline Company. In docket number 18-174, John Thibodeaux claims he was exposed to the air release while visiting friends at an apartment on Cities Service Highway in Sulphur. In docket number 18-175, Yvonne Glasgo claims she was exposed to slop oil while at the same I-210 beach Ricky Matthews was at on June 20, 2006. In docket number 18-176, Ellis Jack Jr. claims he was exposed to toxins released by CITGO while fishing in Calcasieu Lake on some unspecified date. In docket number 18-179, Albert Doucet Jr., Debra McZeal, Tommy Mumford, and John Smith claim they were exposed to toxins released by CITGO while working at the Louisiana Pigment Company in Sulphur, Louisiana.

Following the trial, the trial court determined that each of the twenty-six plaintiffs had been exposed to the slop oil, to the chemicals from the air release, or to both. The trial court awarded damages in four categories. The trial court awarded medical expenses associated with the exposure, and three categories of general damages: pain and suffering, fear of developing future disease, and loss of enjoyment of life. The damages awarded to each plaintiff are set forth as follows:

| Plaintiff | Medical expenses | Pain and suffering | Fear of developing disease | Loss of enjoyment of life | Total |
|---|---|---|---|---|---|
| Patrick Bowling | $ 350.00 | $ 28,000.00 | $ - | $ 10,000.00 | $ 38,350.00 |
| Michael Colletta | $ 350.00 | $ 21,000.00 | $ 10,000.00 | $ 5,000.00 | $ 36,350.00 |
| Michael Crewell | $ 350.00 | $ 25,000.00 | $ - | $ 10,000.00 | $ 35,350.00 |
| Dustin Daigle | $ 350.00 | $ 5,000.00 | $ 10,000.00 | $ 3,500.00 | $ 18,850.00 |
| Zachary Forsyth | $ 350.00 | $ 4,500.00 | $ - | $ 3,000.00 | $ 7,850.00 |
| Chris Judice | $ 350.00 | $ 13,000.00 | $ 10,000.00 | $ 5,000.00 | $ 28,350.00 |
| Terryl Lambright | $ 350.00 | $ 10,000.00 | $ 10,000.00 | $ 3,500.00 | $ 23,850.00 |
| Stephen L'Hoste | $ 350.00 | $ 10,000.00 | $ 15,000.00 | $ 12,500.00 | $ 37,850.00 |
| Larry Martin | $ 416.00 | $ 7,000.00 | $ 10,000.00 | $ 4,000.00 | $ 21,416.00 |
| Richard McCoy | $ 537.00 | $ 28,000.00 | $ 10,000.00 | $ 10,000.00 | $ 48,537.00 |
| Robert Paggen | $ 350.00 | $ 21,000.00 | $ 10,000.00 | $ 5,000.00 | $ 36,350.00 |
| Corey Spikes | $ 200.00 | $ 7,500.00 | $ 10,000.00 | $ 3,500.00 | $ 21,200.00 |
| Sammy Timpa | $ 350.00 | $ 28,000.00 | $ 15,000.00 | $ 10,000.00 | $ 53,350.00 |
| Alton Young | $ 350.00 | $ 28,000.00 | $ 10,000.00 | $ 10,000.00 | $ 48,350.00 |
| Donald Mouton | $ 200.00 | $ 5,000.00 | $ 10,000.00 | $ 3,500.00 | $ 18,700.00 |
| Ebony (Mouton) Jack | $ 200.00 | $ 10,000.00 | $ 10,000.00 | $ 5,000.00 | $ 25,200.00 |
| Odelia Dowling | $ 200.00 | $ 8,000.00 | $ - | $ 5,000.00 | $ 13,200.00 |
| Ricky Matthews | $ 732.00 | $ 25,000.00 | $ 10,000.00 | $ 10,000.00 | $ 45,732.00 |
| Leslie Mouton | $ 305.00 | $ 10,000.00 | $ 10,000.00 | $ 3,500.00 | $ 23,805.00 |
| John Thibodeaux | $ 200.00 | $ 8,000.00 | $ 10,000.00 | $ 5,000.00 | $ 23,200.00 |
| Yvonnie Glasgo | $ 425.00 | $ 8,500.00 | $ 10,000.00 | $ 5,000.00 | $ 23,925.00 |
| Ellis Jack, Jr. | $ 200.00 | $ 15,000.00 | $ 7,500.00 | $ 5,000.00 | $ 27,700.00 |
| Albert Doucet, Jr. | $ 450.00 | $ 20,000.00 | $ 7,500.00 | $ 7,500.00 | $ 35,450.00 |
| Debra McZeal | $ 350.00 | $ 28,000.00 | $ - | $ 10,000.00 | $ 38,350.00 |
| Tommy Mumford | $ 200.00 | $ 15,000.00 | $ 10,000.00 | $ 5,000.00 | $ 30,200.00 |
| John D. Smith | $ 459.00 | $ 25,000.00 | $ 10,000.00 | $ 10,000.00 | $ 45,459.00 |

Mr. Timpa's damages were reduced to $50,000.00 pursuant to the damages cap stipulated to prior to trial.

CITGO has timely appealed the judgment of the trial court, asserting the following assignments of error:

1. The district court erred in finding that nine of the plaintiffs [Albert Doucet, Odelia Dowling, Yvonne Glasgo, Ellis Jack, Ricky Matthews, Leslie Mouton, Debra McZeal, Tommy Mumford, and John Smith] proved causation, because they failed to present expert testimony or other objective evidence that they were exposed to chemicals released by CITGO. Plaintiffs' lay testimony about detecting an odor or seeing an oily substance in the water, and then experiencing common symptoms such as headaches or sinus congestion, is insufficient to establish exposure without expert testimony showing that they were in fact exposed to CITGO's chemicals.

2. The district court erred in awarding damages for fear of developing disease to eleven plaintiffs [Albert Doucet, Yvonne Glasgo, Ellis Jack, Ricky Matthews, Tommy Mumford, John Smith, Donald Mouton, Ebony Mouton Jack, John Thibodeaux, and Michael Colletta]. Under Louisiana law, a plaintiff must prove that his exposure placed his future health at risk to recover for fears about his future health. Seven plaintiffs failed to prove

4

exposure at all – much less risk of future health problems related to an exposure – and three failed to prove exposure to any substance that possibly could cause future health problems. Thus, their awards for future health concerns were erroneous. An additional plaintiff, Michael Colletta, received an award based on fears about future health even though he gave no testimony about any such fears at trial. His award should be reversed as well.

3. The district court erred in awarding damages for lost enjoyment of life to twenty-four of the twenty-six plaintiffs [all except Terryl Lambright and Stephen L'Hoste] because they did not testify or offer any other evidence about whether and how their quality of life diminished because of their alleged exposure-related injuries.

**ANALYSIS**

*Standard of Review*

This court in *Bradford*, 237 So.3d at 657-58, discussed the applicable standard of review herein:

> An appellate court may not set aside a trial court's findings of fact in the absence of manifest error or unless it is clearly wrong. *Stobart v. State, Through DOTD*, 617 So.2d 880 (La.1993); *Rosell v. ESCO*, 549 So.2d 840 (La.1989). A two-tiered test must be applied in order to reverse the findings of the trial court: (a) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court; and (b) the appellate court must further determine that the record establishes that the finding of the trial court is clearly wrong (manifestly erroneous). *Mart v. Hill*, 505 So.2d 1120 (La.1987).

> Even where the appellate court believes its inferences are more reasonable than the fact finders, reasonable determinations and inferences of fact should not be disturbed on appeal. *Arceneaux v. Domingue*, 365 So.2d 1330 (La.1978). Additionally, a reviewing court must keep in mind that if a trial court's findings are reasonable based upon the entire record and evidence, an appellate court may not reverse said findings even if it is convinced that had it been sitting as trier of fact it would have weighed that evidence differently. *Housely v. Cerise*, 579 So.2d 973 (La.1991). The basis for this principle of review is grounded not only upon the better capacity of the trial court to evaluate live witnesses, but also upon the proper allocation of trial and appellate functions between the respective courts. *Canter v. Koehring Co.*, 283 So.2d 716 (La.1973).

**I. *Causation***

In a personal injury suit, a plaintiff has the burden of proving causation by a preponderance of the evidence. *Maranto v. Goodyear Tire & Rubber Co.*, 94-2603 (La. 2/20/95), 650 So.2d 757. The test for determining a causal relationship between an

5

accident and injury is whether the plaintiff proved through medical testimony that it is more probable than not that the subsequent injuries were caused by the accident. *Maranto*, 650 So.2d 757. CITGO argues that nine plaintiffs failed to prove that their injuries were caused by exposure to either slop oil or the air release. In addition to specific arguments about each of the nine plaintiffs, CITGO re-urges the argument it made unsuccessfully in *Bradford*, 237 So.3d 648, namely that expert testimony is required to prove both general causation and specific causation in a toxic tort case. CITGO, in its brief, acknowledges "a panel of the Third Circuit rejected CITGO's appeal based on this same issue in [*Bradford*], CITGO believes this determination was in error and has submitted a writ application to the Supreme Court, which remains pending at the time of the filing of this brief." The supreme court has since denied the writ application taken on our ruling in *Bradford*. *Bradford v. CITGO Petroleum Corp.*, 18-272 (La. 5/11/18), 241 So.3d 314. Thus, this court has determined that while expert testimony is required to prove causation, it is sufficient that there is expert testimony to prove general causation and medical testimony to establish specific causation. Keeping in mind these principals, we must evaluate whether each of the nine plaintiffs CITGO complains of in its first assignment of error met their burden of proof to establish causation.

CITGO does not dispute the same exposure evidence was submitted in this case as in *Bradford.* The facts indicated the dangers of the oil spill did not evaporate within twenty-four hours of June 19, nor did they abate at any time during the period that the current plaintiffs assert exposure. While some of the plaintiffs could not recall the exact date of their exposures, the record contains circumstantial evidence that tied their exposures to the subject spills. Moreover, we also find wholly without merit any inference by CITGO that any Plaintiff's failure to immediately seek medical treatment and/or continue working after any alleged exposure should be held against them. It is unrefuted that CITGO told the community the released chemicals did not pose any

6

immediate health risk, thus inferring no immediate medical attention was necessary.

We addressed this argument in one of the earlier cases, stating as follows:

> This court in *Anthony* [*v. Georgia Gulf Lake Charles, LLC*, 13-236, p. 8 (La.App. 3 Cir. 5/21/14)], 146 So.3d at 253-54, addressed a similar argument concerning an alleged failure to timely seek medical care after a declaration by the defendant tortfeasor that such medical care was not required:
>
>> As to Georgia Gulf's argument that many of the plaintiffs' damages awards should reflect a failure to timely seek medical attention, plaintiffs note the respective trial judges in *Anthony*, *Billiot* and *Brown I* rejected this argument because it found Georgia Gulf failed to adequately inform the public of the nature of the chemicals released. . . .
>>
>> Thus, we find the respective trial judges in this consolidated appeal had ample support for disregarding Georgia Gulf's argument that many plaintiffs were lax in seeking medical attention in the days following the exposure.
>
> We find a similar situation occurred in the present case, and find the trial court did not err in disregarding CITGO's arguments that Plaintiffs should be penalized for any alleged failure to seek medical attention in the days and weeks following the exposure.

*Arabie*, 175 So.3d at 1186.

As in the numerous prior cases involving the slop oil and air release from the CITGO refinery, the plaintiffs presented Dr. Barry Levy, an occupational and environmental health physician and epidemiologist with thirty-five years of experience, who testified via deposition to establish general causation in this case. As noted by this court previously, "Dr. Levy has clinically evaluated thousands of individuals who had developed, or were at risk of developing, a wide range of adverse health effects as a result of environmental and/or occupational exposure to chemical substances." *Bradford*, 237 So.3d at 661. Also testifying via deposition was Frank M. Parker, III, a Certified Industrial Hygienist, who has published numerous articles on industrial hygiene, toxic exposure, health and safety. Lastly, Plaintiffs offered the testimony of Dr. Steve Springer, a board-certified physician in Family Practice, who has seen and treated hundreds of chemical exposure patients.

7

Mr. Parker testified slop oil was released from the CITGO refinery on June 19, 2006 and contaminated the Calcasieu River coastline all the way to Big Lake. Many of these plaintiffs described in their testimony a sheen or colorful rings in the water and stated they smelled a foul odor. As Plaintiffs note, CITGO has produced no lay or expert testimony to refute Mr. Parker's testimony that placed hazardous chemicals where a sheen or mousse-like substance accumulated as a result of the release. We will examine the causation determinations for each plaintiff CITGO disputes.

*The Louisiana Pigment Employees*

Albert Doucet, Debra Ann McZeal, Tommy Mumford, and John Smith were employees of Louisiana Pigment Company on June 19, 2006. It was alleged they were exposed while working that day. Louisiana Pigment Company is located to the northeast of the CITGO plant. It is approximately two miles from the CITGO refinery and a half mile from the Calcasieu Ship Channel, which was contaminated with slop oil.

Mr. Doucet testified he remembered a "strong smell" during the day in question. He further testified he and several of his co-workers "were looking around to make sure it wasn't nothing from us and then some people in management came out and said it was a release from CITGO." Mr. Doucet testified he had immediate burning of his eyes and nausea. He stated in the days that followed he suffered from burning in his throat, itching, headaches and sinus problems. Dr. Springer testified that Mr. Doucet suffered several days of eye pain, sore throat, nausea, and sinus irritation from exposure to chemicals, and approximately seven months of increased headaches related to exposure of either slop oil or hydrogen sulfide.

Ms. McZeal testified on June 19, 2006, she noticed a "different smell" after which her "[e]yes started burning, her throat started hurting, [and she] got nauseated." She testified she sought treatment with Dr. Springer for those symptoms. She stated she continues to suffer from sinus problems, which she had never experienced prior to

that day. Dr. Springer testified that in his medical opinion, one to two days of nausea, sore throat, and eye burning, and nine months of headaches, sinus congestion, and pain related to sinus congestion were caused by Ms. McZeal's exposure to chemicals from CITGO.

Tommy Mumford testified he was working at Louisiana Pigment on June 6, 2006. He stated he noticed a "distinct smell" that was a "little different." Similar to Mr. Doucet's testimony, he and his co-workers immediately began to investigate if the smell was coming from anything at Louisiana Pigment. He testified he immediately suffered some eye irritation, nausea and sinus problems. He later began suffering from persistent headaches. Dr. Springer testified that he believed Mr. Mumford suffered several days of nausea, nosebleeds, and other sinus issues and more than three months of headaches as a result of exposure to chemicals released by CITGO.

John Smith was also working at Louisiana Pigment on June 19, 2006. Mr. Smith remembered everyone that day talking about the smell in the air and the subsequent realization concerning the chemical release from CITGO. Mr. Smith testified he suffered from eye irritation, nausea and diarrhea. Dr. Springer testified that, in addition to three days of diarrhea and one to two days of nosebleed and eye irritation, Mr. Smith suffered nine months of skin irritation as a result of exposure.

In support of its argument that the Louisiana Pigment plaintiffs failed to prove exposure, CITGO points to testimony from Mr. Parker that for *most* of the day the wind was blowing to the northwest and away from Louisiana Pigment. However, CITGO acknowledges in brief that the wind shifted to the northeast in the afternoon, which supports the Louisiana Pigment plaintiffs' claims that they were exposed. These Louisiana Pigment employees testified they smelled the strong odor in the afternoon. Although CITGO argues in brief that "none of the plaintiffs testified that they detected any odor or began having any symptoms in the late afternoon," this simply ignores the testimony of Albert Doucet (who stated specifically he noticed the "strong smell"

9

sometime "during the day" and immediately his eyes began to water and he felt nauseous), Debra Ann McZeal (that she noticed a "different smell" and immediately her "[e]yes started burning, her throat started hurting, [and she] got nauseated) and Tommy Mumford (who noticed a "distinct smell" and began immediately suffering from eye irritation, nausea and sinus problems). Although John Smith did not specifically testify to recalling the foul odor, he remembered clearly everyone talking about the problems at CITGO, as well as testifying he began suffering from eye irritation, nausea and diarrhea.

Plaintiffs also note in *Bradford*, this court upheld an award of damages to Clara Espree, who was east of Louisiana Pigment when she was found to have been exposed to the air release. While Ms. Espree's location is not in the trial court record before us, we can take notice that a prior panel of this court affirmed the same trial judge's finding of exposure to a plaintiff that was northeast of the CITGO plant, as were the Louisiana Pigment plaintiffs herein.

We find no manifest error in the trial court's finding that each of the above plaintiffs, who were working at Louisiana Pigment on June 19, 2006, proved a causal link between their injuries and the exposure to the release of hydrogen sulfide and sulfur dioxide from the CITGO refinery.

We do note the evidence and testimony herein does not support the trial court's finding that Mr. Mumford and Mr. Smith were also exposed to the slop oil. Both plaintiffs testified they did not come in contact with any oil or see any oil, and the record establishes they were approximately one-half mile away from the water on that day. Thus, we reverse the trial court's finding that those two plaintiffs were exposed to slop oil.[3]

---

[3] We note this finding does not change the general damage award for pain and suffering to either plaintiff, as they are entitled to be compensated for the injuries they proved were linked to the air release from the CITGO refinery. It does, however, require a reversal of the awards to Mr. Mumford and Mr. Smith for fear of developing future disease as per this court's decisions in *Albarado*

10

*Leslie Mouton*

Ms. Mouton testified she was exposed while bringing lunch to her nephew, James Warner, who was working that day at Colonial Pipeline, which was approximately one mile south of the CITGO refinery. Ms. Mouton testified, while at Colonial Pipeline, she noticed an "unbelievable" smell. She stated her eyes started burning and her throat began "tightening up." Ms. Mouton also testified she had to pass in front of the CITGO refinery on her way home from Colonial Pipeline. She suffered from shortness of breath, headaches and sinus problems for several months following the CITGO release, which Dr. Springer related to her exposure.

CITGO argues that Ms. Mouton could not have been exposed because there is no evidence that the air release of hydrogen sulfide or sulfur dioxide reached the facilities at Colonial Pipeline. While Mr. Parker's testimony may not support Ms. Mouton's claim that she was exposed while at Colonial Pipeline, there is ample evidence in the record that the air release crossed Highway 108. There was no dispute that Ms. Mouton drove past the CITGO refinery on Highway 108 on her way home from Colonial Pipeline. Ms. Mouton even testified she recalled noticing much more activity at CITGO when she passed by the plant that day. Therefore, we find the record reasonably supports the trial court's finding of a causal link between Ms. Mouton's injuries and her exposure to the air release from the CITGO refinery.

*Yvonne Glasgo and Ricky Matthews*

Ms. Glasgo and Mr. Matthews were participating in a family event at the I-210 beach on June 20, 2006. This was the same family event for which five plaintiffs were awarded damages for exposure to slop oil, which was subsequently affirmed by this court in *Bradford*. The fact that five plaintiffs recovered damages in *Bradford* does not

_____

and *Fontenot* (wherein we found there is no evidence that exposure to hydrogen sulfide or sulfur dioxide cause long-term health problems; and it was error for the trial courts in those cases to award damages to plaintiffs who only proved exposure to the air release from CITGO).

11

alone satisfy Ms. Glasgo and Mr. Matthew's burden of establishing they suffered injuries due to their alleged exposure at the I-210 beach, but it does establish that this court found the presence of slop oil on the date in question at the I-210 beach. While the *Bradford* court's finding as to causation is not binding on this court in this case for these plaintiffs, it is certainly persuasive. The date, time and location at question before us is identical to that before this court in *Bradford*.

CITGO argues there was no credible evidence to establish the slop oil traveled the approximate three-mile distance upriver to the I-210 beach area. CITGO's reliance on the lack of any report of slop oil traveling that far upriver conveniently ignores that CITGO told its employees to stop trying to determine how far the slop oil went. The line of cases on this disaster reflect CITGO's dilatory behavior in its response to, and investigation of, the release of toxic chemicals into the surrounding community. It was not until 7:39 p.m. on June 23, 2018, four days after the disaster, that CITGO made its first public announcement of the crisis. Mr. Parker repeatedly opined on the failure of CITGO to warn the community as well as his belief CITGO's air monitoring data was inconsistent with first-hand observations obtained from fact witnesses as well as other documents provided by CITGO. See *Arabie v. CITGO Petroleum Corp.*, 10-244 (La.App. 3 Cir. 10/27/10), 49 So.3d 529, *writ granted*, 10-2605 (La. 2/4/11), 56 So.3d 981, *aff'd in part, rev'd in part*, 10-2605 (La. 3/13/12), 89 So.3d 307, wherein this court noted the trial court's finding of fraud on CITGO's part, CITGO's failure to warn the local populace of its existing MSDS on the spilled product, and CITGO's cognizant misinformation to government agencies of the status and capabilities of its facility.

We find the testimony of the plaintiffs, which the trial court found credible, supports the finding of exposure to slop oil. Ms. Glasgo testified she was with the Richard family to celebrate the passing of one of her relatives. She testified while at the beach she started "smelling bad smells and noticed rainbows in the water and noticed that it was an oily substance on the water." Ms. Glasgo testified she had gone

12

in the water on that date and began suffering from nausea and stomach pain. The record also established Ms. Glasgo went to the emergency room two days later for skin boils. She ultimately suffered from months of fatigue and sinus problems. Dr. Springer related her injuries to exposure to slop oil.

Mr. Matthews was also with the Richard Family that day. He testified "a sheen came over the water and it was kind of shiny, different colors . . . and it was a smell, an oily smell." Mr. Matthews noted he and others were standing in the water fishing. He also stated they ate several of the fish they caught that day. He testified he began suffering from stomach problems and headaches, which became on "ongoing type situation." He also experienced shortness of breath, depression, coughing and problems sleeping. Dr. Springer opined Mr. Matthews' injuries were a result of his exposure to slop oil.

We find no manifest error in the trial court's finding that Ms. Glasgo and Mr. Matthews were exposed to slop oil while at the I-210 beach on June 20, 2006 and affirm the award of damages as to these plaintiffs.

*Odelia Dowling*

Ms. Dowling died before the trial of this matter, and before her deposition could be taken. The trial court noted Ms. Dowling brought her daughter's fiancée lunch at the CITGO facility on June 20, 2006 and visited her son at his home which was less than two miles from the CITGO facility. Evidence of her alleged exposure came from a visit to her family physician, Dr. Jason Morris, on July 31, 2006, wherein she complained of headaches, severe sinus congestion, severe post nasal drainage, a dry cough, and an upset stomach with intermittent bouts of diarrhea for several weeks. She told Dr. Morris while at the CITGO facility she smelled a foul odor and became nauseated. Dr. Springer, who did not examine Ms. Dowling, opined, after reading Dr. Morris' report, that her symptoms were related to exposure of chemicals from CITGO.

CITGO notes the air release occurred the day prior to Ms. Dowling coming to the CITGO plant. Thus, they contend there was "limited evidence" regarding Ms. Dowling's exposure to support a causation finding. We disagree. While noting the air release did occur the day before Ms. Dowling visited the CITGO facility, the evidence established in the hours prior to her visit 200,000 pounds of sulfur dioxide and massive amounts of hydrogen sulfide were released into the atmosphere and into the surrounding area, which included her son's residence. The Occupational Health Guideline recommends continued medical surveillance from exposure to sulfur dioxide and hydrogen sulfide because it just doesn't vanish; it lingers. Moreover, if CITGO had timely informed the public of the slop oil and air release, it is highly likely Ms. Dowling would not have driven to the CITGO facility. Thus, we cannot say the trial court manifestly erred in finding Ms. Dowling was exposed to the air release and in awarding damages to Ms. Dowling.

*Ellis Jack*

Mr. Jack testified he was exposed to slop oil when fishing with his daughter and son-in-law somewhere in Big Lake, when "a film of oil just came up on the water."[4] He testified after seeing the film, he pulled up the anchor, and they returned to shore rather than simply changing locations and continuing to fish. Mr. Jack was unable to testify as to what date this occurred on and could only state he believed it was on a weekday. He was certain they launched the boat from the I-210 beach boat launch and

---

[4] We note the trial court mistakenly wrote in its written reasons for judgment that Mr. Jack's injuries were "a result of his exposure to the CITGO air release." As CITGO notes, Mr. Jack's "claim at trial plainly was based on exposure to the oil spill." Plaintiffs also agree the trial court made a mistake in classifying Mr. Jack's exposure as coming from the air release, and note all the factors listed in the trial court's reasons for judgment, i.e., "set out from the 210 beach," "saw an 'oily-type' film out on the water," clearly indicate the trial court intended to find Mr. Jack's exposure was to the slop oil rather than the air release. Thus, it is clear the trial court simply made a mistake (Mr. Jack was one of twenty-six plaintiffs in these consolidated cases). We find reversal of the award to Mr. Jack is warranted, not because of this inadvertent mistake, but because the evidence did not support his alleged exposure to slop oil.

were fishing in Big Lake when the oil film was encountered. He testified he was not aware of the CITGO refinery disaster at that time and only became aware of it later while watching television. Shortly thereafter he contacted an attorney.

CITGO maintains Mr. Jack's story is implausible because to get to Big Lake he would have had to travel past the CITGO refinery down the Calcasieu Ship Channel. The evidence shows that the Coast Guard closed the ship channel to recreational traffic around the CITGO facility (from markers 100-109) beginning the early morning hours of June 21, 2006 until July 6, 2006. This time frame encompasses the time period when Mr. Jack claims he went fishing. If he was fishing in Big Lake on June 21, 2006, or later, the route Mr. Jack would have had to take to get from the I-210 beach to Big Lake was by way of the ship channel, which was closed. Mr. Jack stated he did not see any Coast Guard boats or any clean-up boats when he allegedly went through the ship channel. Mr. Jack was unable to explain this implausibility in his testimony.

Moreover, on cross-examination it was admitted by Mr. Jack that he has filed suit in *numerous* other environmental disaster cases. Just a few months after his alleged exposure to slop oil, he alleged exposure to harmful chemicals in the Georgia Gulf incident, for which he filed suit. Mr. Jack also has filed lawsuits pertaining to a second incident at Georgia Gulf, an incident at Conoco and a prior suit involving the Eunice Train Derailment. Mr. Jack also acknowledged he has "been in several lawsuits involving car accidents."

Mr. Jack also claimed he had been to see Dr. Susan Jones, his family doctor for treatment. No records were introduced at trial as to these visits, and Mr. Jack could only explain this by stating Dr. Jones had suffered a stroke and had to retire. Mr. Jack also stated, despite alleging direct contact with the slop oil, he only required nasal sprays from Dr. Jones. This is inconsistent with direct exposure to slop oil.

We find the evidence and testimony concerning Mr. Jack's alleged exposure to slop oil is too incredulous to warrant an award of damages in this case. The trial court's

15

finding in that regard is unreasonable and manifestly erroneous. We therefore reverse the trial court's judgment finding Mr. Jack was exposed to slop oil and the accompanying award of damages.

## II. _General damages for fear of future injury_

In its second assignment of error, CITGO contends the trial court erred in awarding damages for fear of developing disease to eleven plaintiffs [Albert Doucet, Yvonne Glasgo, Ellis Jack, Ricky Matthews, Tommy Mumford, John Smith, Donald Mouton, Ebony Mouton Jack, John Thibodeaux, and Michael Colletta.]

In *Albarado* and in *Fontenot*, this court found there is no evidence that exposure to hydrogen sulfide or sulfur dioxide cause long-term health problems. Thus, we held that it was error for the trial courts in those cases to award damages for fear of future injury to plaintiffs who only proved exposure to the air release from CITGO. Plaintiffs concede in their brief that CITGO "is correct that awards for future injury for exposure to the air release for Albert Doucet, Leslie Mouton, Donald Mouton, Ebony Mouton Jack, John Thibodeaux and John Smith are inappropriate." Likewise, because we have found that Mr. Mumford was only exposed to the air release, his award for fear of future damages is reversed. The Plaintiffs also concede that Mr. Colletta did not offer any evidence that he feared a future illness as a result of his exposure and that his award for fear of future injury should be reversed. As stated previously, Mr. Jack did not prove he was exposed to the slop oil, therefore his award of damages is reversed in its entirety.

We find no merit in CITGO's contention that the awards rendered to Ricky Matthews and Yvonne Glasgo should be reversed. Both of those plaintiffs proved exposure to slop oil and that their injuries were linked to that exposure. Likewise, both Mr. Matthews and Ms. Glasgo testified they were concerned as to the unknown effects the exposure could have on their future health.

### III.   *General damages for loss of enjoyment of life*

In its third assignment of error, CITGO argues that the loss of enjoyment of life damages to twenty-four of the twenty-six plaintiffs are unsupported by the evidence. The awards for loss of enjoyment of life to Mr. L'Hoste and Mr. Lambright are not challenged in this assignment of error.  "Loss of enjoyment of life refers to detrimental alterations of a person's life or lifestyle *or* a person's inability to participate in the activities or pleasures of life he enjoyed prior to the injury.  *Kelley v. General Insurance Company of America*, 14-180 (La.App. 1 Cir. 12/23/14), 168 So.3d 528, 545, *writs denied*, 15-157, 15-165 (La. 4/10/15), 163 So.3d 816, 816, *citing McGee v. A C and S, Inc.*, 05-1036 (La. 7/10/06), 933 So.2d 770; *see also Day v. Ouachita Parish School Board*, 35,831 (La.App. 2 Cir. 8/8/02), 823 So.2d 1039, *writ denied*, 02-2532 (La. 12/19/02), 833 So.2d 343.

CITGO argues the testimony of the remaining plaintiffs does not show that the exposure to chemicals resulted in a detrimental alteration of their life or an inability to participate in the activities or pleasures of life that were formerly enjoyed.  Plaintiffs argue these twenty-four plaintiffs testified about the symptoms that they suffered from as a result of their exposure to CITGO's release of chemicals, that they continued to live and work while suffering with these maladies, and that the trial court properly found they suffered a disruption in their normal quality of life.  CITGO concedes that distinct general damage awards for 'pain and suffering' and 'loss of enjoyment of life' are appropriate, but only when there is sufficient proof to support each type of loss.

The trial court, in its written reasons for judgment, stated that each of the plaintiffs "suffered an interruption of his normal quality of life."  CITGO points out in its brief that none of the Plaintiffs missed work in this case.  However, as Plaintiffs note, there was never any allegation made that the injuries suffered from the exposure were so debilitating as to make them miss work.  Rather, Plaintiffs maintain the injuries suffered from the exposure made work and life more difficult.  We further note the

damages awards for loss of enjoyment of life to these plaintiffs is low, ranging from $3,000.00 to $10,000.00.

We find the testimony in the record supports the trial court's finding that the plaintiffs suffered a detrimental change to their quality of life. CITGO seems to argue because many plaintiffs did not testify they were prevented from performing certain task or hobbies, this somehow negates the detrimental effects they suffered from their exposure. Finding many of the plaintiffs suffered some combination of persistent headaches, fatigue, nausea, sinus problems and sleeplessness, the trial court was satisfied this amounted to a detrimental alteration to their normal quality of life. We find no error in this finding. We will review the record as to each individual plaintiff CITGO maintains was not entitled to an award of damages related to a loss of enjoyment of life.

*Patrick Bowling*

Mr. Bowling was employed by Phoenix Electric and was exposed to the slop oil at the Calcasieu Refinery jobsite. Similar to many of the Phoenix Electric employees who were exposed to the slop oil, he suffered from "massive" headaches and a constant lack of energy. His symptoms also included burning of his eyes and sinus problems. These complaints were linked to his exposure to the slop oil. We find no manifest error in the trial court's finding that Mr. Bowling's lack of energy and massive headaches caused a detrimental alteration to his life for the period of time they persisted. His award of $10,000.00 for loss of enjoyment of life is supported by the record.

*Michael Colletta*

Mr. Colletta was working for Phoenix Electric when he was exposed to the slop oil at the Calcasieu Refinery jobsite. Due to his exposure Mr. Colletta suffered from a rash and lesions on his skin, as well as persistent headaches and recurring sore throat for approximately six months. These problems were linked to Mr. Colletta's exposure to the slop oil. We find the trial court did not manifestly err in finding these problems

18

caused a detrimental alteration to Mr. Colletta's life for the period of time they persisted. His award of $5,000.00 for loss of enjoyment of life is affirmed.

*Michael Crewell*

Mr. Crewell died prior to the trial on this matter. The transcript of his deposition was entered into evidence in lieu of his testimony. Mr. Crewell was a Phoenix Electric employee who was exposed to slop oil at the Calcasieu Refinery jobsite. Mr. Crewell testified after the exposure he began suffering from recurring migraine headaches, which were so severe as to make him nauseated. He also suffered from shortness of breath, fatigue and sleeplessness as a result of the exposure. Dr. Springer linked Mr. Crewell's problems to the slop oil exposure. We find the trial court did not manifestly err in finding these problems amounted to a detrimental alteration to Mr. Crewell's life. The award of $10,000.00 for loss of enjoyment of life is affirmed.

*Dustin Daigle*

Mr. Daigle was another employee of Phoenix Electric who was exposed to the slop oil while working at the Calcasieu Refinery jobsite. He suffered from eye and sinus irritation, sore throat, coughing and nausea. His major, lasting complaints were severe, migraine headaches and sinus problems. Mr. Daigle specifically testified his migraine headaches and sinus problems had a major impact on his life for several months. Dr. Springer linked Mr. Daigle's problems to his exposure to the slop oil at Calcasieu Refinery. The trial court obviously found Mr. Daigle's testimony credible, and we cannot find the decision to award him $3,500.00 in damages for loss of enjoyment of life manifestly erroneous.

*Zachary Forsyth*

Mr. Forsyth was working for Phoenix Electric when he was exposed to the slop oil while working at Calcasieu Refinery. Mr. Forsyth testified he noticed a foul odor and saw the presence of oil on the bank and booms at the jobsite. Mr. Forsyth's symptoms included dizziness, shortness of breath, sleep problems, nausea, sore throat

and headaches as a result of his exposure. Mr. Forsyth candidly acknowledged his symptoms resolved shortly after the job at Calcasieu Refinery ended. This was reflected in the fact Mr. Forsyth received the smallest awards rendered by the trial court. We find no manifest error in the trial court's award of $3,000.00 to Mr. Forsyth for the detrimental effect the exposure had on his life for that short period.

*Chris Judice*

Mr. Judice was also employed by Phoenix Electric and was exposed to the slop oil at the Calcasieu Refinery jobsite. His main complaints were severe sinus problems, burning of the eyes, headaches and sore throat. His symptoms lasted from four to six months. These complaints were linked to his exposure to the slop oil. We cannot say the trial court manifestly erred in finding these problems detrimentally altered his life and in awarding Mr. Judice $5,000.00 for loss of enjoyment of life.

*Larry Martin*

Mr. Martin was working for Phoenix Electric at the Calcasieu Refinery when he was exposed to the CITGO slop oil release. Mr. Forsyth testified he smelled a foul odor, saw a sheen on the water and oil on the bank of the river. He immediately suffered from burning of the eyes and nausea. He would go on to experience persistent, severe headaches and insomnia for approximately two months. He testified he would be out of breath when performing the most routine of tasks. His problems were linked to the exposure to the CITGO slop oil. We find no manifest error in the trial court's award of $4,000.00 to Mr. Martin for the detrimental effect the exposure had on his life for that period of time.

*Richard McCoy*

Mr. McCoy was another worker employed by Phoenix Electric who was exposed to the slop oil at the Calcasieu Refinery jobsite. He experienced persistent headaches and sinus problems for approximately nine months. He also suffered from nausea and sleeping difficulty after his exposure. He testified he felt constantly run down for that

20

nine-month period, which affected his energy level and led to sexual problems during that period. We cannot say the trial court manifestly erred in finding these problems caused a detrimental alteration to Mr. McCoy's life during that period of time. His award of $10,000.00 for loss of enjoyment of life is affirmed.

*Robert Paggen*

Mr. Paggen was another employee of Phoenix Electric who was exposed to slop oil at the Calcasieu Refinery jobsite. Mr. Paggen testified he smelled a "strong, burning odor" and saw a sheen out on the water. He immediately experienced nausea and a sore throat. His main, longer-term problems were with severe headaches and fatigue for approximately six months. In her reasons for judgment, the trial court noted Mr. Paggen's headaches "significantly impact[ed] his quality of life." We find no manifest error in the trial court's award of $5,000.00 for loss of enjoyment of life.

*Corey Spikes*

Mr. Spikes was another employee of Phoenix Electric who was exposed to the slop oil while working at Calcasieu Refinery. Mr. Spikes testified he immediately suffered from burning in his eyes, nose and throat upon exposure to the slop oil. Mr. Spikes experienced persistent headaches, recurring stomach pain and sleep problems for approximately two months following his exposure. Dr. Springer linked these problems with Mr. Spikes' exposure to the slop oil. We find no manifest error in the trial court's finding that Mr. Bowlings stomach problems and massive headaches caused a detrimental alteration to his life for the two months they persisted. His award of $3,500.00 for loss of enjoyment of life is supported by the record.

*Sammy Timpa*

Mr. Timpa was employed by Phoenix Electric and was exposed to the slop oil at the Calcasieu Refinery jobsite. His main complaints were sore throat, sinus problems, headaches and nose bleeds. Mr. Timpa testified for several months he consistently felt "run down," with little to no energy and shortness of breath. His lack of energy was

21

also compounded by his problems sleeping. He also suffered from persistent, severe headaches for several months. These complaints were linked to his exposure to the slop oil. We cannot say the trial court manifestly erred in finding these problems detrimentally altered his life and in awarding Mr. Timpa $10,000.00 for loss of enjoyment of life.

*Alton Young*

Mr. Young was another employee of Phoenix Electric who was exposed to slop oil at the Calcasieu Refinery jobsite. During his work at the docks, Mr. Young testified he came into physical contact with the slop oil that was in the water. His immediate short-term problems were burning of his eyes, diarrhea and headaches. Long term he had recurring problems with a rash and lesions that would appear on his skin when he became overheated or sweating. There was some discussion as to whether the rash may have been hereditary, but the testimony was it had never appeared prior to the exposure. Dr. Springer concluded Mr. Young's problems were caused by the exposure. We find no manifest error in the trial court's determination that these problems detrimentally altered Mr. Young's life and affirm his award of $10,000.00 for loss of enjoyment of life.

*Albert Doucet*

Mr. Doucet was an employee of Louisiana Pigment who was exposed to the air release from the CITGO refinery. On that date, Mr. Doucet noticed a "strong smell" and suffered an immediate burning of his eyes and nausea. He stated in the days that followed he suffered from burning in his throat, itching, headaches and sinus problems. He also suffered from seven months of persistent headaches and sinus problems. Dr. Springer testified these problems were caused by the exposure to the CITGO air release. We cannot say the trial court manifestly erred in finding these problems caused a detrimental alteration to Mr. Doucet's life for the period of time they persisted. His award of $7,500.00 for loss of enjoyment of life is affirmed.

22

*Debra Ann McZeal*

Ms. McZeal was exposed to the CITGO air release while working at Louisiana Pigment on June 19, 2006. Her immediate symptoms included burning of the eyes, a sore throat and nausea. For approximately nine months she suffered from continual sinus problems and recurring headaches. Dr. Springer related a short period of nausea, sore throat, and eye burning, and nine months of headaches, sinus congestion, and pain to Ms. McZeal's exposure to chemicals from CITGO. We find no manifest error in the trial court's determination that these problems detrimentally altered Ms. McZeal's life and affirm her award of $10,000.00 for loss of enjoyment of life.

*Tommy Mumford*

Mr. Mumford was an employee of Louisiana Pigment who was exposed to the air release from the CITGO refinery on June 19, 2006. On that date, he noticed a "distinct smell" and suffered an immediate burning of his eyes, nausea and coughing. He testified he immediately suffered some eye irritation, nausea and sinus problems. He later began suffering from persistent headaches. Dr. Springer related Mr. Mumford's problems to the air release and opined that Mr. Mumford suffered several days of nausea, nosebleeds, and other sinus issues and more than three months of headaches as a result of exposure to chemicals released by CITGO. We find no manifest error in the trial court's finding that these problems caused a detrimental alteration to Mr. Mumford's life and affirm the award of $5,000.00 for loss of enjoyment of life.

*John Smith*

Mr. Smith was also exposed to the CITGO air release while working at Louisiana Pigment on June 19, 2006. Mr. Smith testified he suffered from eye irritation, nausea and diarrhea. Dr. Springer testified that, in addition to three days of diarrhea and one to two days of nosebleed and eye irritation, Mr. Smith suffered nine months of skin irritation and rash as a result of his exposure. We find no manifest error in the trial court's finding that Mr. Smith incurred a detrimental alteration to his life for the nine

23

months his symptoms persisted. His award of $10,000.00 for loss of enjoyment of life is supported by the record.

*Odelia Dowling*

As we noted previously, Ms. Dowling died before the trial of this matter, and before her deposition could be taken. On June 20, 2006, Ms. Dowling brought her daughter's fiancée lunch at the CITGO facility on June 20, 2006 and visited her son at his home which was less than two miles from the CITGO facility. She complained of headaches, severe sinus congestion, severe post nasal drainage, a dry cough, and an upset stomach with intermittent bouts of diarrhea for several weeks. She also suffered from headaches and respiratory problems for approximately two months. Dr. Springer, attributed her symptoms to exposure to the air release from CITGO. We find no manifest error in the trial court's determination that these problems detrimentally altered Ms. Dowling's life for the period they persisted and affirm her award of $5,000.00 for loss of enjoyment of life.

*Donald Mouton*

Mr. Mouton ran a lawn service and was in the Carlyss area (a few miles from the CITGO refinery) to cut grass. He smelled an unusual odor and his eyes began burning and he started coughing. He sought medical treatment with his family doctor for eye and nose irritation. The evidence established he suffered significant respiratory problems for a little over a month as a result of the exposure. We find no manifest error in the trial court's award of $3,500.00 to Mr. Mouton for the detrimental effect the exposure had on his life for that short period.

*Ebony (Mouton) Jack*

Ms. Jack was with her former husband, Donald Mouton, in the Carlyss area, when she was exposed to the CITGO air release. Ms. Jack was pregnant at the time. She testified she noticed a foul smell and began experiencing dizziness, nausea and headaches. Ms. Jack testified she suffered from persistent headaches, dizziness and

24

shortness of breath for approximately two months.  Dr. Springer linked her problems to the exposure to the air release.  We also note Ms. Jack endured these problems while she was pregnant, which likely exacerbated the difficulties she faced during that period. We do not find the trial court manifestly erred in finding these problems detrimentally altered Ms. Jack's life for the period of time they persisted.  Her award of $5,000.00 for loss of enjoyment of life is affirmed.

*John Thibodeaux*

On June 19, 2006, Mr. Thibodeaux was visiting relatives who lived on Cities Service Highway, which is near the CITGO facility.  He smelled a terrible odor and immediately began experiencing sinus congestion.  He experienced headaches, sinus problems, dizziness and shortness of breath for more than two months.  During that period, he went to the emergency room twice due to his discomfort. Dr. Springer attributed Mr. Thibodeaux's symptoms from exposure to the air release from CITGO. We find no manifest error in the trial court's determination that these problems detrimentally altered Mr. Thibodeaux's life during that period and affirm his award of $5,000.00 for loss of enjoyment of life.

*Leslie Mouton*

Ms. Mouton testified she was exposed to the air release while bringing lunch to her nephew, James Warner, who was working at Colonial Pipeline, which was approximately one mile south of the CITGO refinery.  Ms. Mouton also drove past the CITGO refinery on her way home from Colonial Pipeline.  Ms. Mouton testified she immediately noticed an "unbelievable" smell, and her eyes started burning and her throat began "tightening up."  She suffered from shortness of breath, headaches and sinus problems for several months following the CITGO release, which Dr. Springer related to her exposure.  We cannot say the trial court manifestly erred in finding these problems caused a detrimental alteration to Ms. Mouton's life for the period of time they persisted.  Her award of $3,500.00 for loss of enjoyment of life is affirmed.

*Yvonne Glasgo*

Ms. Glasgo was present at a function at the I-210 beach on June 20, 2006, when she was exposed to slop oil. She testified while at the beach she started "smelling bad smells and noticed rainbows in the water and noticed that it was oily substance on the water." Ms. Glasgo testified she had gone in the water on that date and immediately began suffering from nausea and stomach pain. The record also established Ms. Glasgo went to the emergency room two days later for skin boils. She ultimately suffered from months of fatigue and sinus problems. Dr. Springer related her injuries to exposure to the slop oil. We find no manifest error in the trial court's finding that these problems caused a detrimental alteration to Ms. Glasgo's life and affirm the award of $5,000.00 for loss of enjoyment of life.

*Ricky Matthews*

Like Ms. Glasgo, Mr. Matthews attended the function at the I-210 beach on June 20, 2006, when he was exposed to slop oil. Mr. Matthews testified that "a sheen came over the water and it was kind of shiny, different colors . . . and it was a smell, an oily smell." Mr. Matthews noted during the event he stood in the water fishing and they ate several of the fish they caught that day. He testified he began suffering from stomach problems and headaches, which became on "ongoing type situation." The trial court found Mr. Matthew "experienced respiratory problems, dizziness, anxiety and fatigue for nine (9) months as a result of his exposure." Clearly this had a detrimental effect on Mr. Matthew's quality of life. We find no manifest error in the trial court's award of $10,000.00 for loss of enjoyment of life.

### DECREE

For the reasons assigned herein, the judgment of the trial court finding Ellis Jack, Jr. was exposed to the CITGO release of slop oil and accompanying award of damages is reversed. The finding that Tommy Mumford and John Smith were exposed to slop oil is reversed as the evidence established they were exposed to the air release only.

The portion of the opinion awarding damages for fear of future injury to Michael Colletta, Albert Doucet, Donald Mouton, Leslie Mouton, Larry Mumford, Ebony Mouton Jack, John Smith and John Thibodeaux is reversed. In all other respects the judgment of the trial court is affirmed. All costs of these appeals are assessed to appellant, CITGO Petroleum Corporation.

**AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.**

**CA 18-169 consolidated with CA 18-170, CA 18-171, CA 18-172, CA 18-173, CA 18-174, CA 18-175, CA 18-176, & CA 18-179**

**PATRICK BOWLING, ET AL.**

**VERSUS**

**CITGO PETROLEUM CORPORATION, ET AL.**

**Pickett, J., concurs in part and dissents in part with written reasons.**

A court of appeal will not set aside the findings of fact of a trial court unless it determines the trial court's finding were manifestly erroneous or clearly wrong. *Stobart v. State, through DOTD*, 617 So.2d 880 (La.1993). In reviewing the entire record, the appellate court must find that a reasonable factual basis does not exist for the trial court's finding and that the finding is clearly wrong (manifestly erroneous) in order to reverse a trial court finding based on factual determinations. *Mart v. Hill*, 505 So.2d 1120 (La.1987). When reviewing an issue of law, though, we review the record *de novo* to determine if the trial court's legal conclusions are correct, without deference to the trial court's findings. *Foti v. Holliday*, 09-93 (La. 10/30/09), 27 So.3d 813.

## *Causation*

CITGO argues that nine plaintiffs failed to prove that their injuries were caused by exposure to either slop oil or the air release. In addition to specific arguments about each of the nine plaintiffs, CITGO re-urges the argument it made unsuccessfully in *Bradford v. CITGO Petroleum Corp.*, 17-296 (La.App. 3 Cir. 1/10/18), 237 So.3d 648, *writ denied*, 18-272 (La. 5/11/18), namely that expert testimony is required to prove both general causation and specific causation in a toxic tort case. "General causation" refers to whether a toxic substance can cause a particular harm in the general population, while "specific causation" refers to whether the toxic substance caused a specific person's injury or condition. *Knight*

1

*v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 351 (5th Cir. 2007).  This court rejected that argument.  *See Bradford*, 237 So.3d at 659-660.  The panel in *Bradford* found that while expert testimony is required to prove causation, it is sufficient that there is expert testimony to prove general causation and medical testimony to establish specific causation.  I agree with that conclusion.

Dr.  Barry Levy, a physician and epidemiologist, testified via deposition to establish general causation in this case, as he has done in numerous previous CITGO cases.  Frank Parker, an industrial hygienist, also testified via deposition to establish general causation.  Dr. Steve Springer, a family medicine doctor, testified as to the specific causation of each of the twenty-six plaintiffs in this case.  This court went on in *Bradford*, though, to evaluate not only the medical testimony as to specific causation, but also the circumstances of the exposure as related by individual plaintiffs and evidence as to the spread of the oil slop from CITGO in the days following the release.  Keeping in mind these principles, my review of the evidence provided in this case leads me to a different conclusion than the majority regarding five of the plaintiffs about whether these plaintiffs met their burden of proving specific causation.

*The Louisiana Pigment Employees*

Mr. Doucet, Ms. McZeal, Mr. Mumford, and Mr. Smith were employees of Louisiana Pigment Company when they claim they were exposed to chemicals released from CITGO.  Louisiana Pigment is located to the northeast of the CITGO plant.  To support their claim of exposure, these plaintiffs rely on Mr. Parker's opinion about the amount of hydrogen sulfide and sulfur dioxide released from CITGO's stacks, and a chart purporting to show the wind direction at the time of the thirteen-hour release, beginning at 3 a.m. on June 19, 2006.  We note that the map and wind direction chart introduced in the record in this case, exhibit seven to Mr. Parker's deposition, has print so small as to be illegible.  Further, Mr. Parker's

testimony indicates that the map is color-coded, yet the copy introduced into the record before us is black and white. Thus, we can rely on Mr. Parker's testimony that the wind was generally calm on June 19, 2006, and when it did blow it went from the southeast to the northwest. Exhibit 8 to Mr. Parker's deposition shows the 911 calls made that day, with most of the calls made within a mile radius of CITGO and to the northwest of the facility. Mr. Parker testified that there were no calls from the northeast of CITGO. Mr. Parker also testified that employees of Firestone Polymers, a company directly across the street from CITGO, were exposed to the air release. *See Albarado v. CITGO Petroleum Corp.*, 17-823 (La.App. 3 Cir. 5/16/18), 247 So.3d 818, where the plaintiffs were employees of Firestone Polymers.

The plaintiffs' brief argues that a plaintiff in *Bradford*, Clara Espree, was east of Louisiana Pigment when she was found to have been exposed to the air release. The majority relies on this allegation in reaching its conclusion pertaining to causation. Ms. Espree's location is not in the trial court record before us, and because in issues of fact we are confined to the evidence entered in the record before us, the majority improperly considered her location in this appeal. The specific testimony of these four plaintiffs, and of Dr. Springer about each of these four plaintiffs, must be examined to determine if there is sufficient evidence in *this* record to support the judgment of the trial court.

Albert Doucet, Jr.

Mr. Doucet testified that he was an operator at Louisiana Pigment in June 2006. Mr. Doucet testified that he was on break and remembered a strong smell. He did not remember specifically what day his exposure occurred. He remembers his eyes burning and his throat burning. He claimed at the trial that he still had headaches that would come and go. While he testified that he saw his personal doctor for his symptoms, there were no records of this appointment and Mr. Doucet does not remember when this appointment occurred. Mr. Doucet did not see any oil

3

or come in contact with any oil. Mr. Doucet did not receive any documented treatment for his injuries related to the exposure until he saw Dr. Springer on January 22, 2007.

Dr. Springer testified that Mr. Doucet suffered several days of eye pain, sore throat, nausea, and sinus irritation from exposure to chemicals, and approximately seven months of increased headaches related to exposure of either slop oil or hydrogen sulfide. Dr. Springer did not have an opinion on whether Mr. Doucet was exposed to slop oil or the air release.

The trial court found that Mr. Doucet was exposed to the air release. I find manifest error in that conclusion. There is no evidence in the record to show what day Mr. Doucet smelled the strong odor which allegedly caused his injuries. There is no contemporaneous record of Mr. Doucet seeking medical treatment for these injuries at the time he suffered them. There is no evidence he was actually at work on the day of the release. I would reverse the trial court's finding that Mr. Doucet's injuries are related to exposure to the air release from CITGO. I would also reverse the damages awarded to Mr. Doucet.

Debra McZeal

Ms. McZeal testified that she was at work at Louisiana Pigment on the day of the release. She was on a break outside when she noticed a strong smell. Her eyes started burning, her throat hurt, and she became nauseated. She retreated inside. She never saw any oil on the water or came in contact with oil. Dr. Springer treated Ms. McZeal for her injuries in August 2006. At the time of the trial, she had forgotten about her exposure in June 2006.

Dr. Springer testified that in his medical opinion, one to two days of nausea, sore throat, and eye burning, and nine months of headaches, sinus congestion, and pain related to sinus congestion were caused by Ms. McZeal's exposure to chemicals

4

from CITGO. Dr. Springer testified that he did not know the details of Ms. McZeal's exposure, except that she was at Louisiana Pigment at the time.

While the evidence is paltry, the fact that Ms. McZeal testified that she was at Louisiana Pigment "on the day of the release" constitutes sufficient evidence for the trial court to determine that she was exposed on June 19, 2006. Thus, I concur with the majority that there is no manifest error in the trial court's conclusion that Ms. McZeal was exposed to the air release on June 19, 2006.

Tommy Mumford

Mr. Mumford testified that he was working at Louisiana Pigment on the day of the release. Mr. Mumford noticed a distinct smell, and he recalled his supervisor instructing him to make sure it was not emanating from their site. He suffered some nausea, a little eye irritation, and some sinus issues as a result of the exposure. He did not come in contact with any oil or see any oil. He admitted that he had sinus trouble before the exposure that was irritated by the exposure. He did not seek medical treatment for the symptoms related to his alleged exposure.

Dr. Springer testified that he believed Mr. Mumford suffered several days of nausea, nosebleeds, and other sinus issues and more than three months of headaches as a result of exposure to chemicals released by CITGO. He testified that he never examined Mr. Mumford, though he was around when Mr. Mumford went to his office for a Pulmonary Function Test. His opinion did not include the specific exposure, slop oil or air release, to which Mr. Mumford was exposed.

The trial court found that Mr. Mumford was exposed to the slop oil and the air release. I concur with the majority's conclusion it was manifestly erroneous for the trial court to conclude that Mr. Mumford was exposed to the slop oil. Nevertheless, I agree there is sufficient evidence to support the finding that he was exposed to the air release.

5

John Smith

Mr. Smith did not smell anything out of the ordinary on the day he claims he was exposed to the chemicals released from CITGO. He only came to believe he was exposed when it became a topic of conversation at the plant. At that point, he got concerned and contacted a law firm. He claimed to have no symptoms that lasted more than a few days. Nevertheless, Dr. Springer testified that, in addition to three days of diarrhea and one to two days of nosebleed and eye irritation, Mr. Smith suffered nine months of skin irritation as a result of exposure. Dr. Springer clarified that the skin irritation would only be caused by exposure to slop oil, not to the air release. Dr. Springer also testified that he does not know if Mr. Smith was exposed to the slop oil or to the air release.

I find manifest error in the trial court's conclusion that Mr. Smith was exposed to the air release or to slop oil. Mr. Smith, by his own admission, cannot recall his exposure. I concur with the majority that there is no evidence that he was exposed to slop oil. I would reverse the judgment of the trial court finding Mr. Smith's injuries were caused by CITGO, as well as the award of damages to Mr. Smith.

*Leslie Mouton*

I agree with the conclusion reached by the majority that evidence supports the trial court's finding that Ms. Mouton was exposed to the air release.

*Yvonne Glasgo and Ricky Matthews*

CITGO argues that there is no evidence that the slop oil from CITGO reached the 210 beach, which was 3.6 miles upriver from CITGO, by June 20, 2006. The plaintiffs argue that this court, in *Bradford*, affirmed a judgment finding that four attendees of the Richard family event were exposed to slop oil, and Ms. Glasgo and Mr. Matthews were at the same Richard family event. They argue the findings of fact in *Bradford* constitute sufficient proof of exposure in this case. I disagree.

6

The plaintiffs, through their brief, reference findings of fact in *Bradford* which they argue support the trial court's findings of causation in this case. Proof of a fact in one lawsuit does not constitute proof of a fact in a totally separate suit. This court is confined to a review of the record before us as to a review of causation. The plaintiff must provide proof in <u>this</u> record that harm suffered by the plaintiffs before us was caused by the named defendant. Causation cannot be presumed. While a factual issue may be common to two suits, a court's factual determination in a suit involving one person is not res judicata or binding in another suit involving a different party or parties. *State, through Dept. of Highways*, 215 So.2d 142 (La.App. 3 Cir. 1968), citing *Knighten v. American Auto. Ins. Co.*, 121 So.2d 344 (La.App. 1 Cir. 1960); *see also* La.R.S. 13:4231 ("a valid and final judgment is conclusive between the **same** parties").

According to Harvey Yee, an employee of CITGO who was on the internal team who investigated the events of June 19, 2006, the release of slop oil into the Indian Marais, a navigable channel that flows into the Calcasieu River and is adjacent to the CITGO facility, occurred between 4:45 a.m. and 5:00 p.m. on June 19, 2006. According to a timeline attached to the deposition of Darryl O'Bryant, despite efforts to contain the spill by deploying booms, the evidence in the record before us shows that the first time there was a report of slop oil in the Calcasieu River was at 7:50 p.m. on June 20, 2006. This was several hours after Ms. Glasgo and Mr. Matthews claim to have been exposed at the 210 beach. There is no credible evidence to suggest that the slop oil traveled 3.6 miles upriver to the 210 beach during the daytime hours. The slop oil had to travel upriver to reach the beach. The only evidence in the record before us is that it reached the river late on that same day. Notably, Mr. Parker, when asked in his deposition, testified that he had no opinion about whether the slop oil reached the 210 beach on June 20, 2006. In fact,

7

the only evidence before us is that it was not possible for the slop oil to have reached the beach at the time the plaintiffs say they were there.

The plaintiffs point to no evidence that the slop oil reached that location except Dr. Springer's testimony that "The court in *Bradford v. CITGO* established that the Richards and Ms. Glasgo were at the 210 beach on June 20th and that the oil had reached that area by that time." Dr. Springer clearly solely relied on a court ruling in another case to conclude exposure, not any medical finding. This circular logic does not constitute proof of a tort. Unlike Angelina Richard in *Bradford*, there is no contemporaneous visit to the doctor to complain of symptoms. In fact, Ms. Glasgo went to the emergency room on June 22, 2006, complaining of boils on her skin, but did not make any mention of exposure to slop oil. Her first complaint of symptoms was when she saw Dr. Arimura in August 2006. Mr. Matthews first saw a physician for symptoms he alleged were related to the CITGO release of slop oil in September 2006. Mr. Matthews was also unclear on whether he was at the beach on June 19 or June 20. Mr. Matthews' records from Dr. Arimura's office state he was exposed to benzene a week after the June 19 or 20 exposure.

Given that there is no evidence in the record that the slop oil from CITGO reached the 210 beach by June 20, 2006, and in fact the evidence reflects it could not have, Yvonne Glasgo and Ricky Matthews failed to meet their burden of proving exposure to CITGO slop oil. I would reverse the judgment of the trial court to the contrary and the award of damages to Ms. Glasgo and Mr. Matthews.

*Odelia Dowling*

Ms. Dowling died before the trial of this matter, and before her deposition could be taken. The only evidence of her is exposure is her statement to Dr. Jason Morris on July 31, 2006, complaining of headaches, severe sinus congestion, severe post nasal drainage, a dry cough, and an upset stomach with intermittent bouts of diarrhea for five weeks. She told Dr. Morris that she delivered lunch to her

8

daughter's fiancée on June 20, 2006. Dr. Springer, who did not examine Ms. Dowling, opined that her symptoms were related to exposure of chemicals from CITGO. The trial court found she was exposed to the air release from CITGO and that exposure caused her injuries. It is undisputed, however, that the air release ended on the afternoon of June 19, 2006. The air release had completely ceased twenty hours before she was at the plant. I would find that the trial court committed manifest error in finding Ms. Dowling was exposed to the air release and in awarding damages to Ms. Dowling.

*Ellis Jack*

I concur with the majority's conclusion that Mr. Jack failed to prove causation and with the reversal of the award of damages to Mr. Jack.

## General damages for future injury

For the reasons assigned by the majority, I concur in the reversal of the award for general damages for fear of future injury to Leslie Mouton, Donald Mouton, Ebony Mouton Jack, John Thibodeaux, Tommy Mumford, Michael Colletta, and Ellis Jack. Because I find that Albert Doucet, John Smith, Ricky Matthews, and Yvonne Glasgo failed to prove exposure as outlined above, I would also reverse their awards for fear of future injury.

## General damages for fear loss of enjoyment of life

In its third assignment of error, CITGO argues that the loss of enjoyment of life damages to twenty-four of the twenty-six plaintiffs are unsupported by the evidence. The awards for loss of enjoyment of life to Mr. L'Hoste and Mr. Lambright are not challenged in this assignment of error. CITGO argues that the testimony of the remaining plaintiffs does not show that the exposure to chemicals resulted in "detrimental alterations of a person's life or lifestyle or a person's inability to participate in the activities or pleasures of life that were formerly

9

enjoyed." *McGee v. A C and S, Inc.*, 05-1036, p. 3 (La. 7/10/06), 933 So.2d 770, 774. In the plaintiffs' brief, they argue that these twenty-four plaintiffs testified about the symptoms that they suffered from as a result of their exposure to CITGO's release of chemicals, that they continued to live and work while suffering with these maladies, and that the trial court properly found they suffered a disruption in their normal quality of life. The plaintiffs also argue that it was wholly appropriate for the trial court to make general damage awards for both pain and suffering and loss of enjoyment of life, citing *McGee*. CITGO concedes that distinct general damage awards for 'pain and suffering' and 'loss of enjoyment of life' are appropriate, but only when there is sufficient proof to support each type of loss.

In *McGee*, 933 So.2d 770, 774-75, the supreme court recognized loss of enjoyment of life as an element of general damages, stating:

> La. C.C. art. 2315 authorizes a tort victim to be compensated for the damage sustained as a result of the delict, including those for loss of enjoyment of life, if proven. Moreover, this court has clearly defined general damages to include loss of enjoyment of life. Consequently, loss of enjoyment of life is a compensable component of general damages under both La. C.C. art. 2315 and this court's existing definition of general damages. Therefore, the only remaining issue is whether loss of enjoyment of life may be separated from other elements of general damages, such as mental and physical pain and suffering, and whether that separation may be reflected by having a line for loss of enjoyment of life on a jury verdict form. *See Joseph v. Broussard Rice Mill, Inc.*, 00-0628, p. 1 (La.10/30/00), 772 So.2d 94, 106-107 (Victory, J., assigning additional reasons) (stating "this Court has never squarely addressed the issue of awarding hedonic damages for loss of enjoyment of life as a separate element of damages").

> As established above, loss of enjoyment of life is a component of general damages and therefore loss of enjoyment of life is not separate and distinct from general damages. Nevertheless, general damages in Louisiana are routinely dissected. Courts commonly list different elements of general damages, including mental anguish and physical pain and suffering, both past and future, separately. In addition, general damages for permanent scarring and/or disfigurement are often listed separately. *See, e.g., Joseph*, 00-0628 at p. 17 (La.10/30/00), 772 So.2d at 106-107, n. 6; *Degruise v. Houma Courier Newspaper Corp.*, 95-1862, p. 9 (La.11/25/96), 683 So.2d 689, 694. Thus, allowing a separate award for loss of enjoyment of life would not offend the existing concept of general damages and would reflect the accepted method of listing elements of general damages separately.

Moreover, loss of enjoyment of life is conceptually distinct from other components of general damages, including pain and suffering. Pain and suffering, both physical and mental, refers to the pain, discomfort, inconvenience, anguish, and emotional trauma that accompanies an injury. Loss of enjoyment of life, in comparison, refers to detrimental alterations of the person's life or lifestyle or the person's inability to participate in the activities or pleasures of life that were formerly enjoyed prior to the injury. In contrast to pain and suffering, whether or not a plaintiff experiences a detrimental lifestyle change depends on both the nature and severity of the injury and the lifestyle of the plaintiff prior to the injury.

This court, citing *McGee*, recently explained that a factfinder must consider the nature and severity of the injury to the plaintiff and the lifestyle he enjoyed prior to the injury when determining whether he sustained a loss of enjoyment of life. *Minton v. GEICO Casualty Co.*, 16-592 (La.App. 3 Cir. 3/8/17), 215 So.3d 290. The trial court, in its written reasons for judgment, stated that each of the plaintiffs "suffered an interruption of his normal quality of life."

This court awarded damages of $30,000.00 for loss of enjoyment of life to a plaintiff who, as a result of injuries suffered in a car accident, could not care for her aged mother, needed her son's help in doing household chores, and could no longer participate in activities she enjoyed, particularly dancing and running. *Clement v. Citron*, 13-63 (La.App. 6/19/13), 115 So.3d 1260. In *Minton*, 215 So.3d 290, this court awarded $75,000.00 for loss of enjoyment of life damages for a plaintiff who could no longer umpire or bowl as a result of his injuries, and whose activities with his grandchildren and at church were limited. In *Stutes v. Greenwood Motor Lines, Inc.*, 17-52, 17-567, 17-568 (La.App. 3 Cir. 11/22/17), 234 So.2d 75, this court affirmed an award of $6,000,000.00 for loss of enjoyment of life damages to a plaintiff rendered a paraplegic when a tractor-trailer crossed the center line and collided with his vehicle. Mr. Stutes introduced evidence that he needed assistance with his bodily functions, had little privacy, and he can no longer dress or feed himself. He also testified that he enjoyed hunting, fishing, gardening, and

woodworking before the accident. He also expressed sadness that he would not be able to play with his expected grandchild as he would have had he not been injured. Each of the plaintiffs in these three cases introduced evidence to support the award of damages for loss of enjoyment of life.

In this case, there was testimony from each of the plaintiffs about their pain and suffering related to their exposure to chemicals released by CITGO, as outlined by the majority. The trial court granted damages for pain and suffering. We can find no evidence, testimonial or documentary, to show how any one of the plaintiffs suffered a detrimental change in their lifestyle. There was no evidence adduced that any plaintiff was unable to perform any task or enjoy any pleasure or any activity before June 19, 2006, that they could not perform after their exposure to the chemical released by CITGO. In fact, what evidence that was elicited from plaintiffs shows that they <u>did not</u> suffer any damages related to a loss of enjoyment of life. Several plaintiffs testified that they did not miss any work because of their exposure. Only three plaintiffs specifically testified about potential loss of enjoyment of life damages. Mr. Mumford testified under cross-examination that his exposure to slop oil fumes <u>did not</u> interfere with daily activities outside of work. Ms. Glasgo, whose damages we reverse because she failed to prove causation, testified under cross-examination that her symptoms <u>did not</u> prevent her from doing any hobbies or activities. This testimony does not support a finding that these two plaintiffs are entitled to damages for loss of enjoyment of life. Mr. Daigle, during redirect examination, testified that his headaches and sinus issues for one or two months had a major impact on his life, but he did not say how. Mr. Crewell, in a deposition taken before he died, stated that he missed one day of work because of a migraine headache approximately six weeks after the exposure. This testimony, given the lack of specific details about how either of these men's lives were affected, is insufficient to support an award for loss of enjoyment of life damages.

12

I would find that of those plaintiffs who proved exposure to either the CITGO release of slop oil or of hydrogen sulfide and sulfur dioxide, the evidence presented in this record supports the claims for pain and suffering awarded to the plaintiffs. However, I find those plaintiffs failed to prove entitlement to damages for loss of enjoyment of life, and the trial court erred in making an award for loss of enjoyment of life damages. Thus, I would reverse the following monetary awards: in docket number 18-169, to Mr. Bowling, $10,000.00; to Mr. Colletta, $5,000.00; to Mr. Crewell, $10,000.00; to Mr. Daigle, $3,500.00; to Mr. Forsyth, $3,000.00; to Mr. Judice, $5,000.00; to Mr. Martin, $4,000.00; to Mr. McCoy, $10,000.00; to Mr. Paggen, $5,000.00; to Mr. Spikes, $3,500.00; to Mr. Timpa, $10,000.00; to Mr. Young, $10,000.00; in docket number 18-170, to Mr. Mouton, $3,500.00; to Ms. Jack, $5,000.00; in docket number 18-173, to Ms. Mouton, $3,500.00; in docket number 18-174, to Mr. Thibodeaux, $5,000.00; and in docket number 18-179, to Ms. McZeal, $10,000.00 and to Mr. Mumford, $5,000.00.

## CONCLUSION

As it relates to the plaintiffs in docket number 18-169, I concur that the judgment of the trial court awarding $10,000.00 to Michael Colletta for general damages for fear of developing disease should be reversed. I dissent from the majority opinion and would reverse the judgment of the trial court awarding $10,000.00 to Patrick Bowling, $5,000.00 to Mr. Colletta, $10,000.00 to Michael Crewell, $3,500.00 to Dustin Daigle, $3,000.00 to Zachary Forsyth, $5,000.00 to Chris Judice, $4,000.00 to Larry Martin, $10,000.00 to Richard McCoy, $5,000.00 to Robert Paggen, $3,500.00 to Corey Spikes, and $10,000.00 to Alton Young for general damages for loss of enjoyment of life. I would amend Mr. Timpa's damage award to $43,350.00. In all other respects, the I concur that judgment of the trial court in docket number 18-169 should be affirmed.

13

As it relates to the plaintiffs in docket number 18-170, I concur with the majority that the judgment of the trial court awarding $10,000.00 to Donald Mouton and $10,000.00 to Ebony Mouton Jack for general damages for fear of developing disease should be reversed. I dissent from the majority opinion and would reverse the judgment of the trial court awarding $3,500.00 to Mr. Mouton and $5,000.00 to Ms. Jack for general damages for loss of enjoyment of life. In all other respects, I concur that the judgment of the trial court in docket number 18-170 should be affirmed.

As it relates to the plaintiff in docket number 18-171, I dissent from the majority opinion and would reverse the judgment of the trial court finding the damages alleged by Odelia Dowling were caused by the release of hydrogen sulfide or sulfur dioxide into the air by CITGO and would reverse the damages in the amount of $13,200.00 awarded to Ms. Dowling.

As it relates to the plaintiff in docket number 18-172, I dissent from the majority opinion and would reverse the judgment of the trial court finding the damages alleged by Ricky Matthews were caused by exposure to slop oil released by CITGO and would reverse the damages in the amount of $45,732.00 awarded to Mr. Matthews.

As it relates to the plaintiff in docket number 18-173, I concur in the opinion of the majority that the judgment of the trial court finding Leslie Mouton's damages were caused by exposure to hydrogen sulfide and sulfur dioxide released into the air by CITGO. I agree that the judgment of the trial court awarding $10,000.00 to Ms. Mouton for fear of developing disease should be reversed. I dissent from the majority opinion and would reverse the judgment of the trial court awarding $3,500.00 to Ms. Mouton for general damages for loss of enjoyment of life. In all other respects, I agree that the judgment of the trial court should be affirmed.

As it relates to the plaintiff in docket number 18-174, I agree that the judgment of the trial court awarding $10,000.00 to John Thibodeaux for fear of developing disease should be reversed. I dissent from the majority opinion and would reverse the judgment of the trial court awarding $5,000.00 to Mr. Thibodeaux for general damages for loss of enjoyment of life. In all other respects, I agree that the judgment of the trial court should be affirmed.

As it relates to the plaintiff in docket number 18-175, I dissent from the majority opinion and would reverse the judgment of the trial court finding the damages alleged by Yvonne Glasgo were caused by exposure to slop oil released by CITGO and would reverse the damages in the amount of $23,925.00 awarded to Ms. Glasgo.

As it relates to the plaintiff in docket number 18-176, I agree with the majority that the judgment of the trial court finding the damages alleged by Ellis Jack, Jr. were caused by exposure to hydrogen sulfide or sulfur dioxide released into the air by CITGO should be reversed, as well as the damages in the amount of $27,700.00 awarded to Mr. Jack.

As it relates to the plaintiffs in docket number 18-179, I dissent from the majority and would reverse the judgment of the trial court finding the damages alleged by Albert Doucet, Jr. were caused by exposure to hydrogen sulfide or sulfur dioxide released into the air by CITGO and the damages in the amount of $35,450.00 awarded to Mr. Doucet. I dissent from the majority and would reverse the judgment of the trial court finding the damages alleged by John Smith were causes by exposure to the air release by CITGO or to slop oil released by CITGO and the damages in the amount of $45,459.00 awarded to Mr. Smith. I concur that the judgment of the trial court finding Debra McZeal's damages were caused by exposure to hydrogen sulfide and sulfur dioxide released into the air by CITGO should be affirmed. I dissent from the majority and would reverse the judgment of the trial court awarding

15

$10,000.00 to Ms. McZeal for general damages for loss of enjoyment of life. I concur with the majority in affirming the judgment of the trial court finding Tommy Mumford's damages were caused by exposure to hydrogen sulfide and sulfur dioxide released into the air by CITGO but the trial court's finding that Mr. Mumford's damages were caused by exposure to slop oil released by CITGO should be reversed. I agree with the majority opinion that the judgment of the trial court awarding $10,000.00 to Mr. Mumford for general damages for fear of developing disease should be reversed. I dissent from the majority opinion and would reverse the judgment of the trial court awarding $5,000.00 to Mr. Mumford for general damages for loss of enjoyment of life. In all other respects, I would find the judgment of the trial court should be affirmed.